COURT OF APPEALS OF VIRGINIA

Present:  Judges Willis, Elder and Senior Judge Cole
Argued at Richmond, Virginia


TERRENCE MARCELLUS WOOLARD

MEMORANDUM OPINION* BY

v.    Record No. 2648-99-1        JUDGE MARVIN F. COLE
                                    JULY 18, 2000

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Edward W. Hanson, Jr., Judge

Andrew G. Wiggin (Donald E. Lee, Jr. and
Associates, on briefs), for appellant.

Eugene Murphy, Assistant Attorney General
(Mark L. Earley, Attorney General, on brief),
for appellee.


Terrence Marcellus Woolard (appellant) appeals from a

judgment of the Circuit Court of the City of Virginia Beach

convicting him of first degree murder, conspiracy, and burglary.

He contends the trial court erred by 1) refusing to sever his

trial from that of his codefendants; 2) admitting his

codefendants' out-of-court statements into evidence against him;

and 3) denying his motions to strike the evidence and set aside

the jury's verdict on the ground that the evidence was

insufficient to convict him.  For the reasons that follow, we

reverse appellant's convictions.

_____

        * Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

Background

During the course of their investigation into the July 25, 1997 burglary of Tara Harper's residence and the resulting murder of her boyfriend, William McKleny, the police interrogated appellant, Toney Griffin, Jerry Norman, Santo Langley, and Armard Smith.  All five men were ultimately charged with conspiracy, burglary, first degree murder, and using a firearm in the commission of murder.  Over appellant's objection, the trial court ruled that appellant and his codefendants would be tried jointly.  The court also ruled that the statements made by appellant's codefendants would be admissible against appellant.

At trial, appellant testified that sometime after 1:00 a.m. on July 25, he and Langley drove to the Northridge section of Virginia Beach, following Griffin, Norman, and Smith, who were in Norman's car.  When Griffin, who was driving Norman's car, stopped on a street near Harper's neighborhood, appellant parked behind him.  Appellant stated that Griffin, Norman, and Smith exited Norman's car and walked away.

Not long thereafter, appellant and Langley started to walk down the street.  Appellant testified that he heard voices behind one of the townhouses, so he walked down a cut behind the residences toward the voices.  He soon came upon Smith, who was standing in Harper's backyard.  Appellant testified that Harper's back door was ajar, so he stepped into the house.

-

Concluding, however, that something was not right, he exited the house, told Smith he was leaving, and started back for his car. On the way, appellant encountered Langley, who joined him. Appellant testified that, shortly thereafter, he heard a gunshot and then Smith and Norman came running back to the cars from the direction of Harper's residence. Griffin also came running back to the cars, but from another direction, where the police eventually recovered the murder weapon.

Because Griffin had apparently misplaced the keys to Norman's car, the codefendants all entered appellant's car. Appellant drove to a nearby shopping plaza where he dropped off everyone.

Appellant denied any involvement in planning the burglary, denied knowing that his codefendants intended to break into Harper's residence, denied agreeing to help anyone to commit a crime, and claimed he was unaware that any of his codefendants were armed. Although admitting that he entered Harper's residence, he stated that he did not know that the house had been forcibly entered.

In his July 25, 1997 statement to the police, appellant denied any culpability. Although at one point he told Detective Orr that his codefendants had planned the burglary, he insisted that he had not been involved in planning the crime and denied acting as a lookout. He did admit knowing that Griffin and

-

Norman were armed.  Appellant testified at trial that he was

unaware that any crime had been planned until after it occurred.

Detective Orr, who interrogated Langley, testified that

Langley

> admitted that he had been present and took
> part in the conversation which took place
> between him and the four other co-defendants
> prior to the incident occurring.  He
> admitted that he had a discussion about
> breaking in the home because the resident of
> that home was supposed to have money.
>
> They, being the group, thought that the
> resident was an affluent drug dealer. . . .
>
> [Langley] ultimately admitted that he
> had knocked on the door.  He explained the
> others in the group had told him to do that
> in the planning part of the conversation.

Langley testified at trial and retracted his confession.  His

trial testimony did not incriminate appellant.

In his July 26, 1997 statement to the police, Smith said

appellant was present when Griffin broke into the townhouse.  He

stated that appellant kept running back and forth between the

gate to Harper's yard and the cut.  Smith also indicated that

everybody was talking about going to the house, where they

believed a drug dealer resided.

Norman told police that Smith was talking to everyone about

a man's house where they could get some money and that this

man--Big Mike--was a big time drug dealer who supposedly had a

lot of money.

-

At the time Smith gave his videotaped statement to the police, he was under arrest. Norman confessed knowing that he too was going to be charged in connection with these crimes.

The jury convicted all the defendants of conspiracy, burglary, and first degree murder. Griffin and Norman were also convicted of using a firearm in the commission of a felony.

## Analysis

"In all criminal prosecutions, state as well as federal, the accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, 'to be confronted with the witnesses against him.'" Lilly v. Virginia, 527 U.S. 116, 123 (1999). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845 (1990). The admission of a non-testifying codefendant's custodial confession violates a defendant's rights under the Confrontation Clause unless the prosecution can otherwise establish the inherent reliability of the confession. See Lilly, 527 U.S. at 137-38.

"An accomplice's custodial confession that incriminates a codefendant is presumptively unreliable in the context of an alleged Confrontation Clause violation." Bass v. Commonwealth, 31 Va. App. 373, 382, 523 S.E.2d 534, 539 (2000) (citing Lilly,

-

527 U.S. 116).  In order for such a confession to be admissible, it

> must be "supported by a 'showing of
> particularized guarantees of
> trustworthiness.'"  The particularized
> guarantees of trustworthiness necessary to
> rebut the presumption of unreliability must
> "be drawn from the totality of circumstances
> that surround the making of the statement
> and that render the declarant particularly
> worthy of belief."  Evidence admitted based
> upon the existence of particularized
> guarantees of trustworthiness must be so
> trustworthy that adversarial testing would
> add little to its reliability.

Id. at 383-84, 523 S.E.2d at 539 (citations omitted).  Factors that a court can consider in determining the reliability of a confession include 1) the accomplice's unawareness of the fact that he has been implicated in a crime by a codefendant; 2) the police's ignorance of the confessor's involvement in the crime confessed; and 3) "the exercise of any contemporaneous cross-examination by counsel or its equivalent."  Id. at 384, 523 S.E.2d at 539.

A codefendant's confession can be admitted if it is substantially identical to the defendant's confession, that is, if the two confessions interlock.  See id. at 384-85, 523 S.E.2d at 540.

> "If those portions of the codefendant's
> purportedly 'interlocking' statement which
> bear to any significant degree on the
> defendant's participation in the crime are
> not thoroughly substantiated by the
> defendant's own confession, the admission of
> the statement poses too serious a threat to

-

> the accuracy of the verdict to be countenanced by the Sixth Amendment. In other words, when the discrepancies between the statements are not insignificant, the codefendant's confession may not be admitted." Conversely, an accomplice's statement that does not "interlock" with the defendant's statement may be admitted against the defendant if the areas of disagreement are irrelevant or trivial.

Id. at 385, 523 S.E.2d at 540.

Langley testified and was subject to cross-examination. Any initial Confrontation Clause error caused by the admission of his confession, therefore, was rectified when he took the stand. On the other hand, neither Smith, Norman, nor Griffin testified at trial. At the time Smith and Norman confessed, they were in custody and knew they were going to be charged with the burglary and McKleny's murder. When Griffin at first denied any involvement in these crimes, he was quickly advised by the interrogating officers that they had evidence tending to prove the contrary, that Norman was waiting to be interrogated, and that appellant was on his way to the police station. Furthermore, the codefendants' incriminating confessions did not interlock with appellant's statement.

The Commonwealth failed to establish the inherent reliability of Norman, Smith, and Griffin's confessions, and the trial court erred in admitting this evidence. Appellant's convictions must be reversed, therefore, unless we can determine that the error was harmless.

-

The standard that guides our analysis of the harmless error issue in this case is clear. Thus, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt;" otherwise the conviction under review must be set aside. This standard requires a determination of "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." In making that determination, the reviewing court is to consider a host of factors, including the importance of the tainted evidence in the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and the overall strength of the prosecution's case.

Lilly v. Commonwealth, 258 Va. 548, 551, 523 S.E.2d 208, 209 (1999) (citations omitted).

Griffin did not implicate appellant as a principal in these crimes, so the admission of his confession was harmless error. But the admission of Smith and Norman's confessions prejudiced appellant. There was no physical evidence that proved appellant's involvement in these crimes, appellant denied any intentional wrongdoing, and Langley recanted his incriminating confession. With the exception of Langley's confession, the confessions of Norman and Smith constituted the only direct evidence that proved appellant's involvement in committing these crimes. Accordingly, because we cannot conclude that admitting this evidence was harmless beyond a reasonable doubt, appellant's convictions must be reversed.

-

The judgment of the trial court is reversed, and the case is remanded to the trial court for retrial if the Commonwealth be so advised.  In light of our holding, we need not address appellant's other assignments of error.

<u>Reversed and remanded.</u>